### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| PERCIVAL PARTNERS LIMITED, REIPLO HOLDINGS, LLC <br><br> Plaintiffs, <br><br> v. <br><br> PAA KWESI NDUOM; INTERNATIONAL BUSINESS SOLUTIONS, LLC; GROUPE NDUOM; YVONNE NDUOM; NANA KWEKU NDUOM; EDJAH NDUOM; NANA ABA NDUOM; JOHN DOES 1-10 <br><br> Defendants. | Case No. _____ <br><br> **JURY TRIAL DEMANDED** |

### COMPLAINT

Plaintiffs Percival Partners Limited ("Percival") and REIPLO Holdings, LLC ("REIPLO") (collectively, "Plaintiffs"), by and through their undersigned counsel, allege as follows:

### INTRODUCTION

1.      This action seeks to hold Defendants, a syndicate of banking entities, shell companies, and directly culpable bad-faith actors, accountable for their scheme to first steal and then launder tens of millions of dollars of investor money into the United States and the Commonwealth of Virginia from the Republic of Ghana through a series of fraudulent conveyances.

2.      In pursuing this scheme, Defendants breached and tortiously interfered with investor contracts, converted at minimum $60 million in investor funds for their own personal gain, fraudulently conveyed those funds from investor-facing entities into shell corporations exclusively owned by them, and committed several racketeering acts prohibited by federal law.

3.    This scheme was devised and executed (and is ongoing to this date) by Defendant Paa Kwesi Nduom ("Paa Kwesi") and his family members, Yvonne Nduom, Nana Kweku Nduom ("Kweku"), Edjah Nduom, and Nana Aba Nduom (collectively, with Paa Kwesi, the "Nduoms"). The Nduoms are all permanent residents or citizens of the United States of America.

4.    Through Defendant Groupe Nduom (the "Nduom Group") and its numerous sub-sidiaries and affiliated entities, the Nduoms solicited hundreds of millions of dollars from investors and customers across the world who believed their funds would be managed in good-faith, subject to appropriate standards of professional conduct and fiduciary duties, and according to the valid and binding contracts they had entered into. Instead, the Nduoms, wholly abusing the corporate form of the Nduom Group and its subsidiaries, fraudulently conveyed at minimum $60 million in investor funds to International Business Solutions, LLC, a secret LLC owned by the Nduoms in Virginia. From there, the Nduoms orchestrated transfers from the LLC to multiple companies owned by the Nduoms as well as to their own personal bank accounts.

5.    As a result of this scheme, the Nduoms were able to enjoy a lavish lifestyle in the United States all while shielding the proceeds from their scheme from regulatory action back home in Ghana.

6.    The extent and expanse of the Nduoms' scheme was first initially discovered in August 2019, when Ghana's central banking authority, the Bank of Ghana, announced it was re-voking the licenses of over 23 Nduom Group subsidiaries. In its report, the Bank of Ghana detailed the numerous ways in which the Nduom Group subsidiaries failed to observe corporate formalities, engaged in numerous undocumented affiliate transactions that were not at arm's-length, and abused investor confidences by siphoning money into shell companies owned solely by the Nduoms.

7.      Most critically, the Bank of Ghana concluded that consumer and investor deposits in Nduom Group subsidiaries GN Bank Gold Coast Securities ("Gold Coast") were being: (1) wrongfully pooled by the Nduom Group with complete disregard to corporate formalities; (2) illegally converted into foreign currencies; and (3) fraudulently transferred to International Business Services, LLC ("IBS"), a private holding company incorporated and having its agent for service of process in Virginia wholly owned by the Nduoms. According to the Bank of Ghana, the scale of the Nduoms' scheme was massive. The Bank of Ghana alleged that the Nduoms fraudulently transferred at least over $62,000,000 to IBS and that GN Bank was missing over $150,000,000 in consumer deposits. By November 2019, the Security and Exchange Commission of Ghana revoked Gold Coast's license to provide investment advisory services.

8.       Like so many others, Plaintiffs were significantly and directly harmed by Defendants' unlawful conduct. Plaintiffs invested millions of dollars in Gold Coast, which offered investment management, wealth management, and brokerage services in Ghana. Gold Coast solicited investments from the public promising high returns on capital by investing in securities, government treasury notes, financial instruments, projects and commodities. In Plaintiffs' case, Gold Coast committed to Plaintiffs that it would invest funds into microfinance opportunities, and that Plaintiffs would receive 25-30% per annum return in the form of interest on their investment, which is a reasonable rate of return for this type of microfinance investment.

9.      By the time payment of interest and principal came due, however, Gold Coast had become insolvent due to the Nduoms' money laundering scheme and was unable to return any of Plaintiffs' funds.

10.     The following graphic depicts the Nduoms' money laundering scheme.



11.     When Plaintiffs confronted the Nduoms regarding their wrongdoing, Defendant Kweku began to personally negotiate with Plaintiffs regarding alternative ways that the Nduom Group could satisfy Gold Coast's debt. During these negotiations, the Nduoms acknowledged that no corporate formalities existed between Nduom Group subsidiaries and assets were frequently comingled for the Nduoms' benefit. For example, beginning in September 2019, Kweku offered to satisfy Plaintiffs' debt in Gold Coast by transferring land owned by another Nduom Group subsidiary, Yorke Properties, to Plaintiffs. When Plaintiffs raised concerns regarding the use of properties owned by Yorke Properties to satisfy Gold Coast's debt, Kweku stated that the subsidiary at

hand "is owned individually by my parents, as is Gold Coast" and thus such a transfer was appropriate. Describing the Nduom Group structure, Kweku remarked that its subsidiaries were "all owned by the same people" and that the Nduom Group "ha[s] other land and surely something can be worked out." In that vein, in a separate discussion, Kweku suggested transferring the Nduoms' personal residence in Takoradi, Ghana to one of Plaintiffs to satisfy Gold Coast's debts. In another discussion with Plaintiffs, Kweku suggested paying Plaintiffs back for Gold Coast's debt by issuing them equity in one of the Nduom Group's life insurance subsidiaries.

12.    Throughout the discussions and negotiations, Kweku acknowledged that the Nduoms owed money to Plaintiffs. In one conversation, Kweku stated that "I[']m being very honest when I say that if we had liquid assets readily available we would be using them to pay customers such as yourself." In another conversation, Kweku committed that the Nduoms "can and will redeem your investment." Separately, Kweku stated that the Nduoms were chasing payments from contractors and that "[w]hen the money comes in I plan to pay you some cash as an interim measure while we work on a longer-term solution for you." Despite these pledges, and over a year of Kweku committing to pay Plaintiffs back for their investment, Plaintiffs have not received a single penny in the form of principal or interest.

13.    Plaintiffs thus bring the instant action to seek redress for the unlawful and wrongful acts committed against them by the Nduom Family and associated entities, including: the Nduoms' tortious inducement of Gold Coast's breach of its investment contract with Plaintiffs, the Nduoms' tortious conversion of Plaintiffs' investments, the Nduoms' fraudulent conveyance of at minimum $60 million to avoid repaying creditors like Plaintiffs, and the Nduoms' participation in a RICO enterprise through which the Nduoms' committed numerous predicate acts to the direct detriment of Plaintiffs.

14.     Plaintiffs seek compensatory damages, punitive damages, and declaratory relief for Defendants' wrongful and unlawful acts, along with all damages provided for by statute or equity.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367, insofar as a federal court has jurisdiction over an entire action, including state-law claims, whenever the federal-law claims and state-law claims in the case derive from a common nucleus of operative fact and are such that a plaintiff would ordinarily be expected to try them all in one judicial proceeding.

16.     This Court also has separate subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2). Plaintiff Percival Partners is incorporated in Ghana. Likewise, Plaintiff REIPLO is incorporated in Delaware. None of its members reside in Virginia.

17.     This Court may exercise *in personam* jurisdiction over the non-Virginia resident Defendants to this action if (1) the exercise of jurisdiction is authorized under the state's long-arm statute, and (2) the exercise of jurisdiction comports with due process.  Both requirements are met.

18.     Venue is proper in this District and Division pursuant to 28 U.S.C § 1391(b) and Local Civil Rule 3.

19.     Plaintiff Percival is an investment firm headquartered in Accra, Ghana that transacts across the world. A number of Percival's investors are American.

20.     Plaintiff REIPLO is a limited liability corporation incorporated in Delaware with its principal place of business in New York, NY. REIPLO is the assignee of the legal claims of an American citizen who invested in Gold Coast.

21.     Defendant Paa Kwesi is the Chairman and Chief Executive Officer of Defendant Groupe Nduom, Gold Coast, and GN Bank. Paa Kwesi is also the beneficial owner of Defendant

International Business Solutions, LLC. Paa Kwesi is a permanent resident of the United States and resides in this District in Falls Church, Virginia.

22.    Defendant Yvonne Nduom ("Yvonne") is a Senior Vice President and board member of Defendant Groupe Nduom, GN Bank, and Gold Coast. Upon information and belief, Yvonne Nduom is a permanent resident of the United States and resides in this District in Falls Church, Virginia. Yvonne Nduom is the wife of Defendant Paa Kwesi Nduom.

23.    Defendant Nana Kweku Nduom ("Kweku") is a board member of Defendant Groupe Nduom and the Chief Executive Officer and founder of IBS, the Virginia entity which the Bank of Ghana alleged received over $62,000,000 in fraudulent transfers from Group Nduom subsidiaries including Gold Coast and Ghana Growth Fund. Upon information and belief, Kweku is a citizen of the United States. Kweku is the son of Paa Kwesi and Yvonne Nduom.

24.    Defendant Edjah Nduom is a board member of Defendant Groupe Nduom and the son of Defendants Paa Kwesi Nduom and Yvonne Nduom. Upon information and belief, Defendant Edjah Nduom is a citizen of the United States and resides in Atlanta, Georgia.

25.    Defendant Nana Aba Nduom is a board member of Defendant Groupe Nduom and the daughter of Defendants Paa Kwesi Nduom and Yvonne Nduom. Upon information and belief, Defendant Edjah Nduom is a citizen of the United States and resides in Redmond, Washington.

26.    Defendant IBS is a foreign limited-liability company incorporated under the laws of Virginia, maintains an agent for service of process in Alexandria, Virginia, and is qualified to do business in the Commonwealth of Virginia. Upon information and belief, IBS is wholly owned, dominated, and controlled by the Nduoms. IBS's registered address is 5509 Vine St, Alexandria, VA 22310.

27.    Defendant Groupe Nduom is a multinational company engaged in various business operations across the world, including the management, direction and control of Gold Coast, GN Bank, Illinois, Ghana Growth Fund Limited as well as sixty other subsidiary companies across the world. Groupe Nduom's US headquarters are located at 5509 Vine St, Alexandria, VA 22310. As a result of its office in Virginia, as well as the operations of a number of its subsidiaries within Virginia, Groupe Nduom transacts significant business within the State.

28.    Defendant Groupe Nduom USA, LLC is a limited-liability company registered under the laws of Nevada. Groupe Nduom USA, LLC's members include Paa Kwesi, Yvonne, Kweku, and Edjah Nduom. Groupe Nduom USA, LLC's sole manager is Defendant IBS.

29.    John Doe Defendants 1-10 represent other entities to whom IBS or the Nduoms transferred monies received from Gold Coast.

30.    Gold Coast at all material times herein was and is an investment, wealth management and brokerage company registered under the laws of Ghana. Gold Coast's license was revoked by Ghana's Security and Exchange Commission on November 8, 2019.

## FACTS

### A.    Overview of the Nduom Group

31.    The Nduom Group is a multinational holding company that was founded by Defendant Paa Kwesi. The Nduom Group's US operations are headquartered in Alexandria, Virginia. The Nduom Group serves as the parent entity for almost sixty subsidiaries which provide a variety of financial services across the world. Among the Nduom Group's subsidiaries are Gold Coast, Ghana Growth Opportunity Fund, and GN Bank.

32.    Before founding the Nduom Group, Paa Kwesi received his bachelor's and Ph.D. in the United States, after which he worked as a consultant for Deloitte in Milwaukee, Wisconsin.

33.     Along with Paa Kwesi, the Nduom Group is run by Defendants Yvonne, Kweku, Edjah Nduom, and Nana Aba Nduom. All five serve as directors of the Nduom Group and, before the Nduom Group's web site was taken down, were displayed prominently as the company's "leadership" group.

34.     Upon information and belief, all the Nduoms are citizens or permanent residents of the United States. Furthermore, all the Nduoms currently reside in the United States.

**B.     Plaintiffs Invest in Nduom Group Subsidiary, Gold Coast, in 2018**

35.     Two of the Nduom Group's most prominent subsidiaries in Ghana were GN Bank and Gold Coast. GN Bank was a financial institution which provided traditional banking and financial services to Ghanaian consumers and businesses, including maintaining savings and checking accounts, making loans, and engaging in currency conversion transactions.

36.     Gold Coast, another subsidiary of the Nduom Group, was a full-service investment bank in Ghana founded in 1993. Gold Coast provided retail and commercial investors with investment advisory services, including pension fund management, brokerage accounts, financial advisory, and corporate finance consultancy services.

37.     As with the Nduom Group, Gold Coast was run and owned by the Nduoms. Paa Kwesi served as Chairman of Gold Coast's Board of Directors and his sons, Kweku and Edjah Nduom also served as directors of Gold Coast. Gold Coast's website prominently represented Paa Kwesi, Kweku, and Edjah Nduom as members of Gold's Coast leadership, with Paa Kwesi being listed as "Board Chairman of Gold Coast" and Edjah and Kweku Nduom being listed as "Board Members."

38.      Among Gold Coast's numerous offerings were structured finance investments. These investments were designed so that investors would contribute monies to Gold Coast which Gold Coast would then distribute as microfinance loans to small and family businesses in Africa

that needed capital. Those microfinance loans would bear interest which, in turn, would serve as the basis for the interest Gold Coast offered to investors for its structured finance investments.

39.     Beginning in March 2018, Percival entered into a number of structured finance investments with Gold Coast. Per the terms of its investments, Percival would receive 28% interest on its investment, with the investments initially maturing after a one-year term. In line with customary banking practices in Ghana, the investments would also automatically roll-over for successive and continuing one-year terms if Percival did not request redemption. After Gold Coast failed to provide interest payments on the loan, Percival sought to liquidate its position in the Fall of 2018. In response, in late October 2018, Gold Coast notified Percival that it was having liquidity issues and Percival's investment would be rolled over an additional one-year term, with an ultimate maturity date of April 2020. As of the filing of this matter, Percival has not received any interest payments or repayment of principal from Gold Coast.

40.     Like Percival, REIPLO's claim originated in July 2018, when an American citizen entered into a one-year fixed deposit structured finance investment with Gold Coast. As with Percival, Gold Coast failed to pay either interest or maturity to the investors, and "rolled" over their initial investment for another one-year term, with a final maturity date of July 2020. As of the filing of this matter, Gold Coast has not issued any payments of principal or interest in relation to the claim.

### C.     Unbeknownst to Plaintiffs, Plaintiffs' Funds are Siphoned Through Fraudulent Conveyance Scheme to IBS and Subsequently to the Nduoms

41.     Unbeknownst to Plaintiffs, Gold Coast did not invest Plaintiffs' funds into microloan investments. Instead, as it had done with tens of millions of dollars of other investor monies, Gold Coast fraudulently conveyed Plaintiffs' moneys out of the Nduom Group for the personal benefit of the Nduoms all while bankrupting Gold Coast.

42.    This was accomplished pursuant to a scheme that was only first partially discovered by Ghana's central bank, the Bank of Ghana, and securities regulator, the Ghana Securities and Exchange Commission, in the fall of 2019.

43.    On August 16, 2019, Ghana's Central Bank, the Bank of Ghana, revoked the licenses of 23 subsidiaries of the Nduom Group, including GN Bank, and announced its investigative findings.

44.    Chief among the Bank of Ghana's reasons for revocation of GN Bank's license was GN Bank's woeful undercapitalization and numerous customers' inability to access their deposit accounts. The Bank of Ghana attributed GN Bank's insolvency to the Nduom Group's abject disregard of the corporate form, which was primarily evidenced by wanton transfers of money between various subsidiaries within the Nduom Group network without any proper documentation or compliance with banking regulations. As the Bank explained, GN Bank's liquidity problems were most significantly due "to overdraft and other facilities it extended to its related parties who are other companies in the Groupe Nduom network of businesses." In particular, the Bank of Ghana alleged that there was a financial revolving door between Gold Coast, GN Bank, and other Nduom Group subsidiaries, within which funds were improperly comingled and moved up the Nduom Group ladder and away from the subsidiaries' creditors.

45.    The Bank of Ghana revealed that the primary purpose of this commingling of assets was to effectuate an extensive money laundering scheme through which GN Bank and Gold Coast's investor monies were fraudulently transferred to IBS, a foreign limited-liability company incorporated in Virginia and run by Kweku, Paa Kwesi, and Yvonne. As the Nduoms explained in a press release they put out upon the Nduom Group's acquisition of a federally chartered banking

institution in Chicago, Illinois, Paa Kwesi and Yvonne "provide managerial, technical and financial services through their management services company, International Business Solutions, LLC." Separately, Kweku has advertised that he is the "founder" of IBS.

46.    According to the Bank of Ghana, Group Nduom used IBS as the conduit for tens of millions of dollars of fraudulent transfers:

> *A recent Bank of Ghana investigation conducted at GN revealed that a significant amount (USD62,255,516.93, GBP718,528.59 and EUR4,200) of depositors' funds held with GN had been transferred to International Business Solutions (another company owned by Groupe Nduom and which is based in the U.S.A) without any documentation to support such transfers* in breach of section 19 of the Foreign Exchange Act 2006, Act 723, Section IV of Bank of Ghana Notice No. BG/GOV/SEC/2007/4, and subsequent Bank of Ghana Notices issued in August 2014 prohibiting such practices.

47.    As the Bank of Ghana's investigation revealed, in order to move investor money from Ghana to the United States, the Nduoms often just wired tens of millions of dollars to IBS without any ostensible purpose or documentation suggesting such transfers were anything other than attempts to move funds away from investors. In the few instances where IBS did maintain documentation related to the transfers, IBS prepared false work invoices which then were paid by the Nduoms through their subsidiaries, including Gold Coast, GN Bank Ghana, and Ghana Growth Fund Limited. By way of example, IBS would charge Gold Coast $100,000 for the provision of "computers," with only $5,000 of that amount being attributed to the provision of computers and the remaining $95,000 being attributed to a so-termed "management fee" to which IBS was not entitled. To support its allegations, the Bank included in its investigative report an excerpted list of transactions to IBS over a limited time-period, which revealed that, as a result of this scheme, *at least* $62,000,000 of investor monies, including Plaintiffs' deposits, were fraudulent transferred between 2017 to 2019, with the total amount of transfers still unknown.

48.     Following up on the Bank of Ghana's investigation, on November 8, 2019, Ghana's Security and Exchange Commission ("SEC") revoked Gold Coast's license to operate in Ghana. As the SEC explained, Gold Coast's license was revoked, in part, for failing to redeem customer requests and the "[p]lacement of client funds with related parties without proper due diligence and the requisite standard of professional conduct." Remarkably, the SEC disclosed that "99.41% of [Gold Coast]'s funds under management had been placed with an unregulated related entity, Ghana Growth Fund Limited (now Gold Coast Advisors Limited)."

49.     Like Gold Coast, Ghana Growth Fund Limited ("Ghana Growth Fund") repeatedly transferred millions of dollars to IBS between 2013 and 2019, paying tens of millions of dollars in so-called "management fees" to IBS for the provision of non-existent services. Ghana Growth Fund is directly run by the Nduoms. In public materials, the Nduoms have acknowledged that Kweku, who also founded and runs IBS, serves as the investment head of Ghana Growth Fund, providing him with "the opportunity to review and approve loans and investments totaling in excess of $100 Million via Ghana Growth Fund Company and GN Bank." Through his position at Ghana Growth Fund, Kweku facilitated the millions of dollars of fraudulent transfers to IBS.

50.     Upon receiving the illicitly money laundered funds, IBS then transferred them to a variety of shell companies owned by the Nduoms across the country, including Defendants Groupe Nduom USA LLC, Defendants John Does 1-10, GN Money, LLC, GN Bank Chicago and the Nduoms individually. None of these entities paid any fair or valid consideration for these transfers of fraudulently conveyed funds.

51.     The following graphic demonstrates the money laundering scheme:



**D.    Plaintiffs are Not Paid Either Principal or Interest by Gold Coast and the Nduoms Personally Attempt to Negotiate Alternate Methods of Satisfying Gold Coast's Debt**

52.    As a result of the Nduoms' scheme, Plaintiffs' investments, rather than being used for microfinance loans, were transferred out of Gold Coast for the personal gain of the Nduoms. Thus, Gold Coast failed to make payments of either interest or principal to Plaintiffs at the time payments of either were due.

53.    Upon Plaintiffs' repeated complaints to Gold Coast about its failure to pay interest or principal, representatives from Gold Coast stated Gold Coast was suffering temporary liquidity and would promptly pay accrued interest. However, despite these empty and endless promises, Gold Coast failed to pay interest or principal throughout the initial one-year term and the two

successive terms. As of the date of the filing, no payments of principal or interest have been made by Gold Coast.

54.    As Plaintiffs continued to seek repayment of their principal and accrued interest from Gold Coast, the Nduoms personally began to negotiate with Plaintiffs on ways they could satisfy Plaintiffs' debt on behalf of Gold Coast. In so doing, the Nduoms confirmed their complete domination of the Nduom Group and its subsidiaries and their use of those subsidiaries for their own personal inequitable gains.

55.    Beginning in September 2019, Kweku personally communicated through WhatsApp with Plaintiffs regarding ways the Nduoms could satisfy Gold Coast's debt. First, Kweku offered land near an airport in Ghana to satisfy Gold Coast's debt. In response to this offer, Plaintiffs inquired into the ownership of the land and its connection to Gold Coast and asked Kweku for proof that the Nduoms had valid title to the property.

56.    In response to Plaintiffs' request, Kweku sent over a land title report showing that the land was owned by a separate entity: Yorke Properties. On September 24, 2019, Plaintiffs asked Kweku for more details about Yorke Properties and its ownership structure, as Plaintiffs had never encountered the company before. In response, on the same day, Kweku wrote to Plaintiffs that "Yorke Properties is owned individually by my parents, as is Gold Coast - Groupe Nduom isn't a parent company per se." These subsidiaries, Kweku noted, "are all owned by the same people."

57.    After discussions regarding the value of the airport property came to a standstill, Kweku stated the Nduoms would try to "find a good deal for [Plaintiffs]" which he was "sure [they] [could] do." As Kweku acknowledged, the Nduoms had "other land and surely something can be worked out." Kweku also claimed that the Nduoms' "obviously don't have the funds to pay

you off - if we did we wouldn't have to start talking about land in the first place." Despite this, Kweku promised that the Nduoms "can and will redeem your investment."

58.     Over the next few months, Kweku continued to offer other parcels of land—none owned by Gold Coast—to satisfy Gold Coast's debt. On one occasion, Kweku offered one of the Nduom's personal residences to satisfy Gold Coast's debt. However, in exchange for the property, Kweku wanted Plaintiffs to "collectively market[ ] these assets" with the Nduoms and Plaintiffs to split any sales proceeds received. Of course, Plaintiffs rejected this offer immediately, refusing to allow the Nduoms to try to earn a profit even when they ostensibly were attempting to repay Plaintiffs. In the end, Kweku's offers turned out to be illusory, as the Ghana SEC had taken actions to freeze any land transactions involving the Nduoms.

59.     Once it became clear a real estate transaction was not suitable, Kweku offered Plaintiffs other assets owned by the Nduoms. One particularly bold suggestion was that Plaintiffs receive "shares equal to 3.5 million in equity if [Plaintiffs] could help the company (I'm thinking about our general or life insurance company) with 1 Million in liquidity to help meet a deadline that is looming."

60.     Even as late as August 2021, Kweku acknowledged Plaintiffs' debt, reaching out to Plaintiffs and stating that he "really wish[ed] we had managed to work it out" and that the "original transaction [had] go[ne] through in 2019."

**E.     Ghanaian Regulators Encourage Attempts to Hold Nduoms Accountable in the U.S.**

61.     Even to this day, the full extent of the Nduom Group's pilfering of investor and consumer monies is unknown. Beyond the $62,000,000 the Bank of Ghana alleged had been fraudulently transferred to IBS between 2017 and 2019, the Bank of Ghana report also stated that over $158,000,000 was missing from GN Bank.

62.    In response to litigation efforts against the Nduoms beginning in the United States, Ghanaian regulators encouraged further litigation attempts against the Nduoms in the United States. As Dr. Ernest Addison, the current Governor of the Bank of Ghana, recently stated regarding litigation attempts against the Nduoms in the United States:

> This question on the GN Bank . . . I thought you will congratulate the Bank of Ghana for the work that was done in trying to identify the problems in that bank [GN Bank] . . . Many people were out there vilifying that we were on a witch-hunt but now you've had people outside this country suing GN Bank for the same reasons . . . So, those who thought that we didn't have a basis for doing what we did, now the evidence is out there that what the Bank of Ghana was trying to do was the appropriate thing.
>
> . . .
>
> Another lesson that can be learnt is the speed in which the system in the U.S works. I mean, we are still grappling with these issues in our Ghanaian courts and are not making any headway... We've been at these reforms for the last 3 years and we are not making the necessary impact and going after these shareholders and directors who have been responsible for malice that we saw in the sector and having them bring back the assets that they have taken out of the banks.

63.    It remains undisputed that the Nduoms have profited handsomely from the money laundering scheme. In addition to using the laundered money to purchase Bank GN Chicago, the Nduoms in recent years have purchased properties across the United States, luxury homes and hotels across the globe, a golf course, a soccer team, and even founded a private business school.

## CAUSES OF ACTION

### Count 1

### CONVERSION

*(Against Defendants IBS, Paa Kwesi Nduom, Yvonne Nduom, Nana Kweku Nduom, Edjah Nduom, Nana Aba Nduom, Nduom Group)*

64.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

65.    Defendants have wrongfully exercised dominion or control over Plaintiffs' monies for their own personal benefit, which even the Nduoms concede have been owed to Plaintiffs and have not been returned.

66.    Plaintiffs invested in numerous structured finance products offered by Gold Coast.

67.    Contrary to the contract signed between the parties agreeing to invest Plaintiffs' money in one-year loans paying 28% interest, Defendants exchanged the deposited amount into dollars, pounds and euros without Plaintiffs' consent and transferred the money to sham companies for the sole benefit of the Nduoms.

68.    Plaintiffs requested that the moneys invested by Plaintiffs in Gold Coast be returned but Defendants have refused to return the monies invested by Plaintiffs in Gold Coast by the date on which Plaintiffs had the right to possession of those monies and the accrued interest. Defendants on several occasions have acknowledged Plaintiffs are owed monies and have promised to pay Plaintiffs back.

69.    Defendants have permanently deprived Plaintiffs of funds worth millions of dollars, causing Plaintiffs' damage.

70.    Accordingly, Plaintiffs demand judgment against Defendants for compensatory damages, including lost profits, and interest thereon, the costs of bringing this action, and such additional relief as this Court deems appropriate. Plaintiffs also demand judgment against Defendants for punitive damages stemming from Defendants' intentional and bad-faith conversion of Plaintiffs' property.

18

## Count 2

## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS

*(Against Defendants Paa Kwesi Nduom, Yvonne Nduom, Nana Kweku Nduom, Edjah Nduom, Nana Aba Nduom, Nduom Group)*

71.     Plaintiffs re-allege and incorporate by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

72.     The elements of tortious interference are: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Schaecher v. Bouffault*, 772 S.E.2d 589, 602 (Va. 2015).

73.     Plaintiffs invested in structured finance products offered by Gold Coast. Per the terms of their contract with Gold Coast, Plaintiffs were to receive their principal and 28% interest a year after their initial investment.

74.     The Nduoms and Defendant Nduom Group each had actual knowledge or reason to know of Gold Coast's contractual relationships with Plaintiffs.

75.     The Nduoms and Defendant Nduom Group intentionally, unjustifiably, and continuously interfered with Plaintiffs' contractual relationships with Gold Coast by causing Gold Coast to transfer all of Plaintiffs' monies to shell companies owned by the Nduoms, thus causing Gold Coast to breach its structured finance investment contracts with Plaintiffs.

76.     The Nduoms and Defendant Nduom Group's intentional, unjustifiable, and continuous interference with Plaintiffs' contractual relationships with Gold Coast was committed in bad-faith or with malicious purpose and in a manner exhibiting wanton and willful disregard for Plaintiffs' rights, interests, and property.

77.    Plaintiffs have suffered substantial damages, including, without limitation, lost profits, because of the Nduoms and Defendant Nduom Group's intentional, unjustifiable, and continuous interference with their contractual relationships with Gold Coast.

78.    Accordingly, Plaintiffs demand judgment against the above-listed Defendants for compensatory damages, including lost profits, and interest thereon, lost business opportunities, the costs of bringing this action, punitive damages, and such additional relief as this Court deems appropriate.

## Count 3

## FRAUDULENT CONVEYANCE

*(Against all Defendants)*

79.    Plaintiffs reallege all prior paragraphs above.

80.    Virginia § 55.1-400 provides that "[e]very (i) gift, conveyance, assignment, or transfer of, or charge upon, any estate, real or personal, (ii) action commenced or order, judgment, or execution suffered or obtained, and (iii) bond or other writing given with intent to delay, hinder, or defraud creditors, purchasers, or other persons of or from what they are or may be lawfully entitled to shall, as to such creditors, purchasers, or other persons or their representatives or assigns, be void."

81.    Virginia § 55.1-401 provides that "[e]very gift, conveyance, assignment, transfer, or charge that is not upon consideration deemed valuable in law, or that is upon consideration of marriage by an insolvent transferor or by a transferor who is thereby rendered insolvent, shall be void as to creditors whose debts were contracted at the time such gift, conveyance, assignment, transfer, or charge was made but shall not, on that account merely, be void as to creditors whose debts have been contracted, or as to purchasers who have purchased, after such gift, conveyance, assignment, transfer, or charge was made."

20

82.    Virginia § 55.1-402 provides that "[b]efore obtaining a judgment for his claim, a creditor may, whether such claim is due and payable or not, institute any action that he may institute after obtaining such judgment to avoid a gift, conveyance, assignment, or transfer of, or charge upon, the estate of his debtor declared void by either § 55.1-400 or 55.1-401. Such creditor may, in such action, have all the relief with respect to such estate to which he would be entitled after obtaining a judgment for the claim for which he may be entitled to recover. A creditor availing himself of this section shall have a lien from the time of bringing his action on all the estate, real and personal, and a petitioning creditor shall also be entitled to a lien from the time of filing his petition in the court in which the action is brought."

83.    The Defendants implemented the fraudulent transfer scheme with the clear intention to hinder creditors from recovering the monies they had invested in Gold Coast, GN Bank, and other Nduom Group subsidiaries, thus violating § 55.1-400. The Defendants' fraudulent transfers to IBS, the Nduoms, and the John Does Defendants were not supported by adequate consideration—indeed, as the Bank of Ghana's investigation revealed, IBS would routinely prepare false work invoices for Gold Coast for "management fees" or "fees" which those entities would pay using investor monies.  At the time these transfers were made, and as a result of these transfers, Gold Coast and GN Bank were insolvent, as recognized by the Bank of Ghana and Securities and Exchange Commission of Ghana.  These transfers thus also violated § 55.1-401.

84.    On the basis of these violations, Plaintiffs also are entitled to have a lien placed on the assets of IBS as well as the Nduoms to ensure that the Defendants do not enact further fraudulent conveyances during the pendency of this litigation. Indeed, Defendants have shown great facility at moving funds domestically and internationally through an extensive network of secret

holding companies. A pre-judgment attachment is the only method to ensure funds remain available should judgment be returned in favor of Plaintiffs.

85.    Plaintiffs are also entitled to payment of attorneys' fees incurred in prosecuting this claim as provided by Virginia Code § 55.1-403. This Court should also award sanctions against Defendants as provided for by § 55.1-403 for devising and executing the fraudulent conveyance scheme alleged by Plaintiffs.

## Count 4

## ALTER EGO/PIERCING THE CORPORATE VEIL

(*Against Defendants International Business Solutions, LLC and Nduom Group*)

86.    Plaintiffs reallege all prior paragraphs above.

87.    In Virginia, a court may pierce the corporate veil upon a showing that "(1) the corporation was the *alter ego*, alias, stooge, or dummy of the other entity; and (2) the corporation was a device or sham used to disguise wrongs, obscure fraud or conceal crime." *Williams v. AES Corp.*, 28 F. Supp. 3d 553, 562 (E.D. Va. 2014) (quotation marks omitted).

88.    Defendants IBS and Nduom Group are *alter egos* of the Nduoms. Indeed, as the Bank of Ghana's investigative finding makes clear, the Nduoms failed to follow any corporate formalities in managing the Nduom Group, comingled funds between the different entities as they saw fit, and ultimately wrongfully transferred tens of millions of dollars from Nduom Group entities to their own personal, private, and secret holding company in Virginia (IBS).

89.    Indeed, these entities are all effectively controlled by the Nduoms. For example, Kweku served as a Director of the Nduom Group and Gold Coast, served as the chief investment officer of Ghana Growth Fund (the entity that Gold Coast secretly) transferred a number of investor funds to, and was the CEO and head of IBS (the recipient of Gold Coast and Ghana Growth Fund's fraudulent transfers). As Kweku himself acknowledged, the Nduom Group subsidiaries "are all

owned by the same people." Indeed, under this theory of "joint-ownership", Kweku repeatedly offered properties owned by other Nduom subsidiaries (and even personal properties) to satisfy the debt ostensibly owned by Gold Coast.

90.    IBS and the Nduom Group were not only *alter egos* of the Nduoms but were clearly used as a device through which the Nduoms executed their fraudulent transfer scheme. Indeed, the Nduoms bankrupted Gold Coast through a series of secret fraudulent transfers to IBS that was only uncovered after the Bank of Ghana's investigation. These transfers were devastating for investors. They were also devastating to Gold Coast, which was rendered insolvent as all its assets had been transferred to IBS.

91.    For these reasons, IBS, Gold Coast, and Group Nduom should be considered *alter egos* of the Nduoms, and any judgment that is reached against any of these three entities should be also extended to the Nduoms.

## Count 5

## VIOLATION OF 18 U.S.C. §§ 1961-1968 (CIVIL RICO)

### (*Against all Defendants*)

92.    Plaintiffs reallege all prior paragraphs above.

93.    Defendants formed an association-in-fact enterprise within the meaning of 18 U.S.C. §1961(4). Defendants shared a common purpose (i.e., the enrichment of the Nduoms and related entities), were associated with one another, and operated for a period sufficient for Defendants to pursue the enterprise's purpose.

94.    Alternatively, the Nduoms formed an association-in-fact enterprise within the meaning of 18 U.S.C. §1961(4). The Nduoms shared a common purpose (i.e., the enrichment of the Nduom family and related entities), were associated with one another, and operated for a period sufficient for Defendants to pursue the enterprise's purpose.

23

95.     Alternatively, Defendants International Business Solutions, LLC, Groupe Nduom USA LLC, and Groupe Nduom formed an association-in-fact enterprise within the meaning of 18 U.S.C. §1961(4). Those Defendants shared a common purpose (i.e., the enrichment of the Nduom family and related entities), were associated with one another, and operated for a period sufficient for Defendants to pursue the enterprise's purpose.

96.      The Nduoms received proceeds from a pattern of criminal activity through which they operated the enterprises listed above, in violation of 18 U.S.C. §1962(a). The Nduoms also, through a pattern of criminal activity, acquired control of the enterprises listed above, in violation of 18 U.S.C. § 1962(b).

97.     The Nduoms have conducted the affairs of the enterprises listed above through a pattern of criminal activity in violation 18 U.S.C. § 1962(c).

98.     The Nduoms conducted and participated, directly or indirectly, in the conduct, management, or operation of the enterprise through repeated acts of racketeering activity amounting to a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

99.     The Nduoms' racketeering activities include the predicate acts of: (1) transporting stolen property in violation of 18.U.S.C. § 2314; (2) possessing stolen property in violation of 18 U.S.C. § 2315; (3) money laundering in violation of 18 U.S.C § 1956; and (4) engaging in monetary transactions with property derived from unlawful transactions in violation of 18 U.S.C § 1957.

100.     18 U.S.C. § 2314 targets any person or entity who "transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud." Through their fraudulent conveyance scheme, the Nduoms repeatedly transmitted tens of millions

of dollars of investor monies to their shell companies in the United States despite knowing those monies had been stolen, converted or taken by fraud from good-faith investors in Gold Coast.

101.    18 U.S.C. § 2314 also targets any person or entity who "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person or persons to travel in, or to be transported in interstate or foreign commerce in the execution or concealment of a scheme or artifice to defraud that person or those persons of money or property having a value of $5,000." The fraudulent conveyance scheme was devised by the Nduoms, who as early as 2013 sought to expropriate their foreign funds into the United States to shield them from regulatory action they knew would one day come (and that did come in Fall 2019). Despite orchestrating over $60 million of fraudulent transfers from Nduom Group subsidiaries, the Nduoms personally solicited investments in Gold Coast and other Nduom Group subsidiaries from investors without disclosing they had devised a fraudulent scheme through which investors would lose all their money.

102.    18 U.S.C. § 2315 targets any person or entity who "receives, possesses, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more... which have crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken." Through the fraudulent conveyance scheme, the Nduoms, IBS, and GN Bank Chicago received, possessed, concealed, and disposed of tens of millions of investor monies despite knowing that those monies had been stolen, unlawfully converted, and taken from Ghanaian investors.

103.    18 U.S.C. §1956(a)(1)(A)-(B) targets any person who "know[s] that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" who conducts a financial transaction that involves that property (i) "with the intent to promote the carrying on of specified unlawful activity" or (ii) "knowing that the transaction is designed in whole or in part... to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

104.    Under 18 U.S.C. §1956, a "financial transaction" is broadly defined to include transactions that affect interstate or foreign commerce, such as a "purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition." The phrase "specified unlawful activity" is defined in 18 U.S.C. § 1956I(7) to include, among other things, "any act or activity constituting an offense listed in section 1961(1)," of the RICO statute. Violations of 18 U.S.C. §§ 2314, 2315 as well as 18 U.S.C. §1957 are listed as offenses under 18 U.S.C. § 1961(1).

105.    The Nduoms transferred investor monies away from Gold Coast and other Nduom subsidiaries into their personal shell companies knowing that the monies were the proceeds of unlawful activity with the goal of promoting the ongoing theft of investor monies. In addition, through the preparation of false invoices from IBS to Gold Coast, the Nduoms transferred the investor monies with the goal of disguising the nature, location, source, and ownership of the monies that were being sent to IBS.

106.    18 U.S.C. § 1957 targets any person who "knowingly engaged in a monetary transaction in criminally derived property." A person violates 18 U.S.C. § 1957 if a person engages in a monetary transaction with property that is "of a value greater than $10,000 [and is] derived from specified unlawful activity." As with 18 U.S.C. § 1956, the phrase "specified unlawful activity" includes, among other things, "any act or activity constituting an offense listed in section 1961(1),"

of the RICO statute. Violations of 18 U.S.C. §§ 2314, 2315 as well as 18 U.S.C. §1956 are listed as offenses under 18 U.S.C. § 1961(1).

107.    The Nduoms knowingly engaged in multiple monetary transactions with the improperly stolen and converted funds in enacting and executing the fraudulent conveyance scheme. Those transactions far exceeded the $10,000 threshold required for liability under 18 U.S.C. § 1957; to wit, they amounted to *at least* $62,000,000.

108.    As a result of the enterprise, Plaintiffs' monies were stolen and converted by the Nduoms, directly harming Plaintiffs as they did not receive either the principal or interest owed on their investments. Defendants' pattern of criminal activity has caused Plaintiffs substantial financial harm.

109.    Accordingly, Plaintiffs demand judgment against Defendants for compensatory damages, including interest thereon and a treble damages award, the costs of bringing this action, and such additional relief as this Court deems appropriate.

### Count 6

### Civil Conspiracy

110.    Plaintiffs reallege all prior paragraphs above.

111.    In Virginia, a common law claim of civil conspiracy lies where there is (i) an agreement between two or more persons (ii) to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, which (iii) results in damage to plaintiff. *Firestone v. Wiley*, 485 F. Supp. 2d 694, 703 (E.D. Va. 2007).   Virginia law also recognizes a statutory claim of civil conspiracy where "two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever or (ii) willfully and maliciously compelling

another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act…" Va. Code Ann. § 18.2-499 (West).

112.    As alleged in detail above, Defendants have conspired to engage in fraud, tortious interference with contractual and business relationships, and unlawful racketeering and enterprise activity against Plaintiffs. Indeed, the Nduoms devised the scheme by which investor monies— rather than being invested in microfinance loans—were siphoned from Nduom Group entities to IBS in Virginia, despite knowing that such transfers were unlawful, fraudulent, not supported by valid consideration, and in violation of the trust and confidences of the Nduom Group's investors. As a result of the Defendants' conspiracy, Plaintiffs have been deprived of their monies and forced to undertake the instant litigation.

## PRAYER FOR RELIEF

WHEREFORE the Plaintiffs pray that this Court:

113.    Award nominal, compensatory, and punitive damages in an amount to be determined at trial but not less than:

    a)  Plaintiffs' initial investment amounts with annual interest applied from date of investment to judgment in an amount to be determined at trial;

    b)  A treble damages award based on Plaintiff's initial investment amounts with an annual interest applied from the date of investment to judgment, in an amount to be determined at trial;

    c)  Punitive damages based on Defendant's malicious, wrongful, and deceitful conduct in an amount to be determined at trial but no less than $62,000,000.

114.    Award litigation costs and expenses to Plaintiff, including, but not limited to, reasonable attorneys' fees;

115.    Avoid all fraudulent transfers executed by Defendants Gold Coast to IBS and subsequently from Defendants IBS to any of the other Defendants as well as John Does;

116.    Imposition of an equitable or constructive trust in favor of Plaintiffs on their property and funds fraudulently transferred or converted by Defendants as well as imposition of pre-judgment lien on the assets of the Nduoms and IBS;

117.    Award any additional and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues triable of right by Jury.

Dated: January 10, 2022          Respectfully submitted,

                                 CHRISTIAN & BARTON

                         By:     /s/ *R. Braxton Hill, IV*
                                 Roman Lifson (VSB #43714)
                                 R. Braxton Hill, IV (VSB #41539)
                                 CHRISTIAN AND BARTON, LLP
                                 901 East Cary Street, Suite 1800
                                 Richmond, VA 23219
                                 Tel : (804) 697-4100
                                 Fax : (804) 697-4112
                                 rlifson@cblaw.com
                                 bhill@cblaw.com

                                 Shomik Ghosh
                                 [to be admitted *pro hac vice*]
                                 MANDEL BHANDARI LLP
                                 80 Pine Street, 33rd Floor
                                 New York, NY 10005
                                 Tel: 212 269 5600
                                 Fax: (646) 964-6667
                                 sg@mandelbhandari.com

                                 Brian Guzman
                                 [to be admitted *pro hac vice*]
                                 GUZMAN ADVISORY PARTNERS
                                 156 West 56th Street, 3rd Floor
                                 New York, NY 10019
                                 Tel: (646) 957-2034
                                 bguzman@guzmanadvisory.com

                                 *Attorneys for Plaintiffs*

                                                              2805551v2